Travis, Admrx., *v*. Pennsylvania Railroad Company, Appellant.

Argued April 1, 1954. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

538

*Bruce R. Martin,* with him *Dalzell, Pringle, Bredin & Martin,* for appellant.

*Vincent M. Casey,* with him *Harry Savage* and *Margiotti & Casey,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, May 25, 1954:

On February 17, 1949, at about 2:30 p.m., Joseph Dorsey Travis, while driving a bread truck, was killed by a southward bound freight train at the South Crossing of the Pennsylvania Railroad Company in the village of Riverton, Madison Township, Armstrong County. In order to enter upon the tracks, Travis was obliged to make a right hand turn from Legislative Route No. 03084 on which he had been travelling. The road at this point makes a sharp descent. At the top and along this descent elderberry bushes, sumac trees and other foliage somewhat concealed (on the day of the accident) the railroad tracks from the view of the traveller.

The administratrix of the estate of the deceased Travis, in her lawsuits against the railroad company in wrongful death and survival actions, averred that the death of her husband was due to the failure of the employes of the railroad company operating the engine which struck Travis to sound an audible warning before approaching the crossing. The defendant company answered that suitable warnings were given and, on this issue of fact, the jury returned verdicts in favor of the plaintiff in both actions. The defendant company moved for judgment n.o.v. and for a new trial. The motion for a new trial was granted and the judgment n.o.v. refused. The defendant appealed.

Upon reading the entire record, we are satisfied that the lower court was fully warranted in refusing a judgment notwithstanding the verdict. The issue involved was strictly one for the jury.

Mrs. Helen A. Catchpole, living 1808 feet north of the South Crossing, testified: "A. Well, I heard the rumble of the train, because it sort of shakes the house, the windows rattle. I watched it for a few minutes because when it is late in the afternoon like that I always watch the train, because my kids crossed there, and kept watching a few minutes. It sort of buckled, stopped, and I have never as yet seen a train do that, so I ran outside, and the other neighbors came running out and said somebody was hit at the crossing. Q. While you were in your house state whether or not you heard any other sound coming from this train than the rumble? A. I heard no whistle, no bell, and it didn't seem to make a chugging noise like most of the trains do. Q. Will you state whether or not you were in position to hear any whistle or bell if one had sounded? A. Oh, if it had blown, I would have heard it. Q. You are positive of that? A. I am positive."

In his brief, counsel for the railroad company states that Mrs. Catchpole did not make "the positive statement that there was no whistle." It will be noted in the above quoted testimony that this witness declared: "Oh, if it [the whistle] had been blown, I would have heard it." An honest person could not make a more positive assertion than that. Without actually being in the engine cab, Mrs. Catchpole could not of her own knowledge say that no one pulled the cord or opened the valve which set off the whistle. However, if one whose hearing is normal, while being in a position to hear and while waiting for a whistle, testifies that no whistle was heard, it can fairly be assumed that there was no whistle. There was good

reason for Mrs. Catchpole to be listening: her children crossed those very same tracks. It can scarcely be doubted that there is any hearing more acute, any sense more delicate, any instrument more sensitive than a mother's ear listening for warning of danger to her offspring.

Appellant's counsel also complains that Mrs. Catchpole did not testify that a bell was not rung. Again calling attention to the testimony hereinbefore quoted, it will be noted that this witness said: "I heard no whistle, *no bell.* ." (Emphasis supplied) What has been stated here about Mrs. Catchpole's reliability as a witness on the failure of a whistle to be blown naturally applies also to her testimony about the failure of the bell to be tolled.

A Mrs. Virginia Travis (not related to the decedent or plaintiff) lived 1676 feet from the crossing. She testified that she heard the crash of the collision: ". . . Then all of a sudden I heard this commotion. It rattled the house and buckled, the cars. I thought it was tearing the house down, and I yelled to my mother and said, 'That train hit something and it didn't blow a whistle.'"

She testified that she thought the train had hit the school bus on the assumption that the bus had come home "early." (Her sister's children travelled on this bus.) This portentous reflection must have sharpened her perceptions and intensified her recollection as to what had occurred immediately prior to the crash. Mrs. Travis also explained that the whistle on the freight engines produces so shrill and piercing a sound that when she hears it she must cover her ears. She did not cover her ears on this occasion.

As against this affirmative testimony on the part of able, alert, and attentive witnesses for the plaintiff, the defendant company presented its affirmative

testimony. The engineer and firemen testified that the whistle was blown even before the train reached the North Crossing (1343 feet north of the South Crossing where the accident occurred.) Two workmen in a toolhouse located halfway between the North and South Crossings testified that they heard the whistle before the train hit the North Crossing. One of the workmen in the same toolhouse, however, testified that he did not hear the train before it stopped.

It is obvious that if the train sounded a whistle, as the engineer and fireman testified, during the time that the train travelled at least 1343 feet and while moving no faster than 25 to 30 miles per hour, the collision at the crossing could not be blamed on the defendant company. On the other hand, if the train, its approach curtained by the foliage on the road, came into the crossing without whistle or bell heralding its advance, and as a consequence Joseph Travis was caught unawares while he was legitimately on the crossing, the defendant company is properly charged with negligence. The contentions of the parties in this litigation could not be more diametrically opposed than if they were on the same track coming toward each other. Only a jury could resolve the controversy. (*Kindt v. Reading Co.*, 352 Pa. 419.)

The defendant railroad company urges judgment n.o.v. on the further ground that the plaintiff's decedent was guilty of contributory negligence as a matter of law. There was no testimony as to what Travis did just before committing himself to the crossing, but the law assumes, in the absence of anything to the contrary, that one who meets sudden death exercised the care of a reasonably prudent person. This is not a makeshift abstraction. It is a legal presumption based on the tenacious and objective reality that life is sweet and death is cruel, and, in the case of rail-

road accidents, is founded on the unassailable logic that no one wants to engage in a duel with a locomotive.

This presumption, then, takes Joseph Travis to the banks of the railroad tracks with an awareness of danger, combined with a normal, prudent desire to avoid it. The defendant company introduced photographs to show the view obtainable by a man with a camera, but the view of a photographer planted behind a tripod on terra firma is clearly quite different from that of a truck-driver sitting in the cab of his truck.

One witness testified that in order to get a long distance view of the railroad tracks it was necessary to stand on the first track. Obviously it could not help a wayfarer much if, in order to determine whether a track was safe, he had to actually step on it. He could thus be hit by the very train he was looking for, seeking to avoid it.

And then, there was the vegetation already referred to which stood 4 to 5 feet high and could effectually screen from view the tracks and what might be on them. Depending again on the angle from which one looks, it is common experience that the slightest intervening item can cover the largest distant object. Angled fingers can wipe out the horizon, while the hand held aloft can blot out the sun. It was strictly a question of fact for the jury whether the elderberry and sumac bushes shut off Travis' view of the railroad track with the train upon it.

In the case of *Baker v. Pennsylvania Railroad Co.*, 369 Pa. 413, which the lower court properly used as authority for its refusal to grant judgment n.o.v., this Court pointed out how the angle at which the hood of an automobile approaching a railroad crossing was elevated made it impossible for the driver to see a

man standing in the middle of the road at the far side of the crossing. In that case we held that where a traveller stops, looks and listens before entering upon a grade crossing and, neither seeing nor hearing anything approaching on the tracks, proceeds and is thereafter struck by a train on a track beyond the first, *the question of his contributory negligence is for the jury,* and the incontrovertible physical facts rule has no application.

Although refusing judgment n.o.v., the court below did order a new trial, to which the defendant railroad company objects. This is somewhat paradoxical in view of the fact that in the lower court the appellant specifically asked for a new trial in the event the judgment n.o.v. was refused. In his brief, appellant's counsel argues that the granting of a new trial was a palpable abuse of discretion. We do not think so.

The order in the court below is affirmed.