Robert E. HAMILTON, Administrator of the Estate of James Lewis Hamilton, deceased, Plaintiff,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

Matthew Leivo & Sons, Inc., Third-Party Defendant.

Civ. A. 9833.

United States District Court
W. D. Pennsylvania.

July 5, 1956.

Joseph Solomon, New Castle, Pa., for plaintiff.

Thomas J. Shannon, Asst. U. S. Atty., Pittsburgh, Pa., for defendant and third-party plaintiff.

V. C. Short, Pittsburgh, Pa., for defendant.

JOHN L. MILLER, District Judge.

This is a proceeding brought under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671-2680. The plaintiff's decedent was fatally electrocuted on August 30, 1949, while employed by the third-party defendant, then engaged in the performance of a contract with the United States to place the Keystone Ordnance Works near Geneva, Pennsylvania, in a stand-by condition. The complaint of the plaintiff administrator sets forth causes of action under the Pennsylvania Wrongful Death and Survival statutes. 12 P.S. §§ 1601-1604; 20 P.S. § 320.601 et seq.

Findings of Fact

1. On August 30, 1949, the United States of America was the owner of the Keystone Ordnance Works, an installation near Geneva, Pennsylvania, comprising about 14,500 acres of land and various buildings and equipment, including certain electrical transformers and oil circuit breakers. The Keystone Works had been used by the government during World War II for the manufacture of TNT.

2. On May 6, 1949, the United States entered into a cost-plus contract with Matthew Leivo & Sons, Inc., (Leivo) whereby the latter was to place the Keystone Works in stand-by, or "mothball", condition. The contract provided for, among other things, the decontamination of plant facilities, limited repairing, prevention of deterioration and preservation of the plant and machinery and the making of an inventory of all production equipment, including the transformers and oil circuit breakers.

3. The contract and accompanying specifications placed chief responsibility for the safety of workmen on Leivo. Specific accident prevention requirements were spelled out and the contractor was required to make daily inspections of the job to see that these requirements and any others made necessary by special circumstances were observed. The contract did not mention any particular precautions which were to be observed with respect to electrical equipment.

4. Under the contract and specifications, the government was obligated to furnish existing utilities, which included electricity, at the site and it did so.

5. The government employed various electricians and maintenance men in connection with furnishing electricity at the site. Leivo also had a staff of electricians in its employ on the project, about 17 inventory personnel and a number of other workers.

6. At the time of the accident, two groups of oil circuit breakers, designated as locations G–16 and G–17, were being used by the government for transmitting electrical power to various buildings on the premises. G–16 was located about 500 feet west of a power station and G–17, about 500 feet east of the station.

7. At G–16, there was a large structural framework on which oil circuit breakers and transformers were installed. The circuit breakers, a group of eight, were suspended on the framework off, but near, the ground, so that serial numbers and catalogue information could be read from them by one in a standing position on the ground. At the center of the area, there were a number of poles on which were installed at a height of about 15 or 18 feet a group of small electrical transformers which were to be included in the inventory of plant equipment. The serial numbers of these transformers could not be read from the ground.

8. Location G–16 differed from G–17 in that G–17 was surrounded by a fence having a gate which was locked and on which there was a large sign warning that the circuit breakers therein were charged with electricity. There had previously been a fence around location G–16, but it had fallen away some years before the accident. No warning sign was placed on the circuit breakers at G–16 and the closest sign present on the day of the accident was some 125 to 200 feet away at a control station west of the power house.

9. At the time of the accident, the United States had knowledge through its duly authorized agents, specifically, its

plant facilities manager, that the circuit breakers at G–16 were charged with electricity, that they were not fenced and that the location itself was not posted with warning signs.

10. Sometime between 1946 and 1948, the War Assets Administration had refused permission for the requisition of materials to construct a fence around location G–16.

11. Prior to the occurrence of the accident, Preston, facilities manager of the defendant, issued oral instructions to the superintendent and safety director of Leivo that workmen of the latter should not go near electrical installations or transformer stations unless accompanied by a government electrician.

12. Leivo issued instructions to its employees through its superintendent, safety engineer and various supervisors including Harold G. Shutts that personnel should not enter any installation or station having wires without first contacting an electrician employed by the government or by the company. Constant warnings on general safety and decontamination dangers were given to Leivo employees during the progress of the work at the plant.

13. Decedent was 19 years old at the time of the accident and had studied for two years in the School of Engineering of the University of Kentucky. He had been employed by Leivo as an inventory clerk on the project for about two months prior to his fatal injury.

14. At the time of the accident, decedent, in the course of his employment, was assisting the company's inventory supervisor, Shutts, in making an inventory of the circuit breakers at location G–16 and was subject to Shutts' direction.

15. Shutts entered location G–16 and proceeded with decedent's assistance to take inventory of the oil circuit breakers, in violation of the company rule which required him to first contact an electrician. Shutts had no actual knowledge that the circuit breakers there were charged but made no investigation to determine whether they were or not.

16. Decedent was equipped with a flashlight which he used to read the numbers from plates fastened on the circuit breakers and he was able to read off the numbers to Shutts while standing on the ground. After obtaining the necessary information from all of the circuit breakers, Shutts, in the process of leaving the area, remarked as to "how we could get the information off of those away up on the poles" with reference to the transformers which were elevated on poles at the center of the location G–16. At the time, decedent was walking behind Shutts. Shutts heard a flash, turned around and observed the decedent "impaled" on an oil circuit breaker. When seen by Shutts, decedent had one hand on the oil circuit breaker and his feet on the frame two feet to thirty inches above the ground.

17. Decedent was climbing upon the circuit breaker at the time of the accident.

18. Decedent was not required in the performance of his duties to climb upon the circuit breaker and had not been directed to do so. Nor was it customary for inventory personnel or decedent to climb upon plant equipment in order to perform their duties.

19. The plant facilities manager of the defendant was negligent in failing to post adequate warning signs at location G–16 when he knew that electricity was passing through the circuit breakers in that area and that workmen of Leivo were required to enter the location in the performance of their duties.

20. The Leivo Company was negligent in violating its own safety rule.

21. Decedent was guilty of contributory negligence.

### Discussion

The Tort Claims Act provides that federal district courts shall have

" * * * exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused

by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Section 1346(b).

■ Accordingly, the court is required to apply the Pennsylvania rule that a supplier of electrical current is bound to use the very highest degree of care practicable to persons who may be lawfully in proximity to and liable to come in contact with its dangerous installations. Brillhart v. Edison Light & Power Co, 1951, 368 Pa. 307, 82 A. 2d 44. Here, the government was chargeable with knowledge that the circuit breakers at location G–16 carried, on the day of the accident, enough electricity to prove fatal to a human being, that the area was not fenced in or posted with adequate warning signs and that the workmen of the Leivo company were required to take inventory of the equipment there. The evidence showed that Preston, the government's plant superintendent, or facilities manager, had personal knowledge of all of these facts. Under the circumstances, there were at least three things which, if done, could have prevented the accident: the government could have erected a fence or barricade at G–16; it could have posted adequate warning signs on the circuit breakers or at the installation so as to leave no doubt as to the danger present; or it could have warned the Leivo company and its men that the circuit breakers were charged with electricity.

■■ Preston, who recognized that he had a duty to exercise care for the safety of the Leivo men issued an instruction to supervisory personnel of the Leivo company that the company's workmen were not to go near electrical installations unless accompanied by a government electrician. That was all that was done. Nevertheless, the government argues that under Pennsylvania law it

performed its full duty to the decedent, since in Pennsylvania the extent of the duty of an owner of premises to an employee of an independent contractor with respect to known or discoverable dangerous conditions on the premises is to warn the contractor of their existence. Valles v. Peoples-Pittsburgh Trust Co., 1940, 339 Pa. 33, 13 A.2d 19, Engle v. Reider, 1951, 366 Pa. 411, 77 A.2d 621, Grace v. Henry Disston & Sons, Inc., 1952, 369 Pa. 265, 85 A.2d 118. Assuming the instruction that workmen of the contractor were not to go near electrical installations without contacting a government electrician was equivalent to a warning that the circuit breakers at location G–16 were active, the Pennsylvania rule of nonliability is not applicable to the facts here. In Commonwealth Trust Co. of Pittsburgh v. Carnegie-Illinois Steel Co., 1945, 353 Pa. 150, 44 A.2d 594, an action was brought against an owner of premises to recover damages for the death of an employee of a subcontractor who was electrocuted when the boom of a crane about which he was working came in contact with high tension wires maintained on the premises by the owner. The owner had given express and repeated warnings both to the subcontractor and its employees regarding the danger of the wires coming in contact with the crane. It was shown, however, that the danger could have been eliminated at a small cost simply by raising the wires. While denying recovery on the ground of the contributory negligence of the decedent, the Supreme Court held, 44 A.2d at page 596:

"Appellee company, however, did nothing to eliminate the dangerous condition existing. That it knew of the danger is shown by the fact that it gave numerous warnings to the sub-contractor and its employees. Clearly, there was sufficient evidence to present a question of fact for the jury on the issue of the company's negligence."

It appears therefore that under Pennsylvania law, the giving of a warning would not necessarily relieve a landowner of

the charge of negligence, so far as instrumentalities carrying electricity are concerned, where some other course would be practicable and more likely to be effective in avoiding injury. If there really were any doubt that the rule of the Valles case does not apply here, it would be resolved effectively by the decision in Cooper v. Heintz Mfg. Co., Pa.1956, 122 A.2d 699, where on facts close enough to these, the Pennsylvania Supreme Court held the Valles principle inapplicable because the exclusive control of the instrumentality, a transformer, causing the harm had not been surrendered by the owner to the contractor. We make the same finding here.

The cost of erecting a sign, even a large one, at location G–16 would have been slight. Likewise, the cost of erecting a simple barricade or fence at G–16 would hardly have been prohibitive. However, since the negligence proved against the government was broader than its mere failure to erect a fence, it becomes unnecessary to discuss whether the refusal of the War Assets Board to permit a fence to be constructed was a discretionary act within the meaning of Section 2680(a), Title 28, U.S.C.A. and Dalehite v. United States, 1953, 346 U.S. 15, 42, 73 S.Ct. 956, 97 L.Ed. 1427.

The evidence was also sufficient to sustain a finding of the third-party defendant's negligence. The contract required Leivo to make a daily inspection of the job for the very purpose of discovering safety hazards and eliminating them. No evidence was introduced to show that any such inspection of location G–16 had been made or that a reasonable inspection would not have disclosed the fact that the circuit breakers were electrified. Passing that question, however, Leivo is directly chargeable with the negligence of its inventory supervisor who violated the standing rule of the company that workmen should not approach electrical installations without first contacting an electrician and who entered location G–16 without taking the slightest precaution to determine the nature of the risk to which he was subjecting the decedent.

The court must deny recovery to the plaintiff because of the contributory negligence of the decedent. Although under Pennsylvania law there is a presumption that one who meets death in an accident has used due care, Travis v. Pennsylvania R. Co., 1954, 377 Pa. 537, 105 A.2d 131, 133, that presumption is of little aid to the plaintiff where lack of care on the part of the decedent affirmatively appears. Hamilton had, of course, observed the circuit breakers prior to his contact with it. He was 19 years of age. He was not new on the job and had two years of engineering school. In view of his age and experience, he was bound to realize that the structure was potentially dangerous to him if charged with electricity and to conduct himself accordingly. Nevertheless, the evidence indicates that he was in the act of climbing upon the circuit breaker at the time of his fatal injury. It is true, no one actually saw him begin to climb, but his position observed immediately after the flash of electricity was heard was incompatible with his having got upon the circuit breaker inadvertently.

While there was evidence that the decedent's duties did not require him to obtain the serial numbers from the overhead transformers, those items were to be included in the inventory and decedent might reasonably have construed Shutts' remark to mean that he should attempt to obtain the necessary information. Nevertheless, the remark could not fairly be interpreted as an invitation to climb upon the circuit breaker—particularly since the decedent could not have obtained the required data even if he had mounted in safety because of the height and position of the transformers.

In Cooper v. Heintz Mfg. Co., supra, 122 A.2d at page 704, the court said:

"When a workman in the discharge of his duties proceeds from a place where it is necessary for him to be to another place where it is necessary for him to go, the law will not proclaim him guilty of contributory negligence if he moves over a route unknown to him, in the

exercise of his normal faculties, to be dangerous."

Conceding that the decedent was in the discharge of his duties at the time, it was not necessary for him to go upon the circuit breaker. The information for the inventory could have been procured with slight delay by the company's maintenance men or electricians who customarily obtained such data from equipment in places difficult of access. Nor could it be said that the decedent moved over a route unknown to him in the exercise of his normal faculties to be dangerous. The most elementary precaution, if taken, would have disclosed to him that the circuit breaker was electrified. The structure was no innocuous appearing fuse box such as was involved in Mac-Dougall v. Pennsylvania P. & L. Co., 1933, 311 Pa. 387, 166 A. 589, but was impressive enough to put a reasonably prudent person on guard. Added to this is the fact that G-16 was situated 500 feet from the government power house and about 200 feet from a control station which decedent and Shutts had passed on their way to the circuit breakers. Then, too, during the time decedent was employed on the job, constant warnings on safety were given by his employer. Whether he personally had been cautioned not to enter electrical installations without an electrician in attendance does not directly appear, but he knew he was working in a dangerous place and was bound to be on the alert. In reading the numbers from the circuit breakers, decedent had used a flashlight and it is not clear why a flashlight would have been necessary on an August afternoon unless to maintain a safe distance from the circuit breakers. It may be that the decedent assumed that his employer had taken advance precautions to make the place safe for his activity. Nevertheless, no one had given him any assurance of safety. In view of the grave consequences that would follow if the assumption was wrong, a reasonable person with due regard for his own safety would not have made it. Under the circumstances, decedent must be charged with knowl-edge of the danger inherent in the circuit breaker. Haertel v. Pennsylvania Light & Power Co., 1908, 219 Pa. 640, 69 A. 282; Cf. Durinzi v. West Penn Power Co., 1947, 357 Pa. 576, 55 A.2d 316; Stoffel v. New York, N. H. & H. R. Co., 2 Cir., 1953, 205 F.2d 411.

## Conclusions of Law

1. The court has jurisdiction of the subject matter and the parties under the Federal Tort Claims Act.

2. The plant superintendent of the United States at the Keystone Ordnance Works was guilty of negligence which was the cause of the accident of August 30, 1949, in which James Lewis Hamilton was fatally injured.

3. Matthew Leivo & Sons, Inc., third-party defendant, was guilty of negligence which was the cause of the accident of August 30, 1949, in which James Lewis Hamilton was fatally injured.

4. James Lewis Hamilton was guilty of contributory negligence.

5. Judgment should be entered in behalf of the defendant, United States of America.

An appropriate order is entered.