Carolyn D. MOORE, Administratrix of the Estate of Phillip P. Morello, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

Jay ASTER, Individually and T/A Wingate Construction Company, Third-Party Defendant, Cross-Claimant and Cross-Claim Defendant,

and

Philadelphia Electric Company, Third-Party Defendant, Cross-Claimant and Cross-Claim Defendant,

and

Russell W. Morello and Anthony Morello, Individually and as Partners T/A Russell W. Morello Excavating and Paving Contractor, Third-Party Defendant, Cross-Claimant and Cross-Claim Defendant.

Civ. A. No. 26811.

United States District Court E. D. Pennsylvania.

March 21, 1963.

See also 217 F.Supp. 309.

Elwood S. Levy, Philadelphia, Pa., for plaintiff.

John J. Harding, Asst. U. S. Atty., for United States of America.

James J. McCabe, Jr., and Richard M. Rosenbleeth, Philadelphia, Pa., for Aster.

John J. McDevitt, 3rd, Philadelphia, Pa., for Philadelphia Electric Co.

Daniel J. Ryan, Philadelphia, Pa., and William F. Fox, Norristown, Pa., for Morellos.

VAN DUSEN, District Judge.

This case is now before the court on post-trial motions [1] of the parties following a finding for the defendant [2] by the trial judge in this personal injury action brought under the Federal Tort Claims Act, 28 U.S.C.A. § 2674. There is substantial evidence in the record to have justified the fact finder's accepting this factual situation:

The accident occurred on September 25, 1957, when plaintiff's decedent, Phillip P. Morello, was fatally electrocuted on land, comprising a Nike Missile Site, owned by the defendant United States of America and located near Potshop and Church (Berks) Roads in Worcester Township, Montgomery County, Pa. (N.T. 53). In September 1957, the decedent had been employed for over ten years (N.T. 1625) by the Morello concern (a third-party defendant), which was digging a ditch (labeled "Gravity Outfall on Sewer Line," on P–5 and P–5A) on defendant's property along a line in general intersecting at a right angle with an existing overhead transmission line of the Philadelphia Electric Company. This transmission line

---

1. The argument on these motions was postponed twice at the request of plaintiff, as indicated by the attached letters of 8/28/62 and 10/9/62. Pursuant to a ruling made at a pre-trial conference held March 1, 1961 (see Document 46 in C.A. 25328), more than a year prior to the trial, the trial of this case started out as a consolidated trial with the jury action of the same plaintiff against Philadelphia Electric Company (C.A. 25328). No post-trial motions have been filed in the jury trial action (C.A. 25328).

2. This finding was "based on * * * findings that (a) the decedent was negligent and (b) such negligence contributed in some degree to his death" (page 2 of Document 71). The judgment for the defendant was entered on this finding on July 24, 1962 (see Document 75), since the Findings and Conclusions of July 13, 1962, were kept in a sealed envelope (Document 70) from July 13 until July 24 with the hope that the parties could effect a settlement of the case. See attached letter of July 13, 1962.

consisted of wires with no insulated covering on them (N.T. 54). In the course of the excavation work, the Morello Company used a mobile crane (with clam shell or bucket) to excavate the ditch along the line which intersected the overhead transmission line referred to above.

On September 25, 1957, at approximately 3:05 P.M., plaintiff's decedent was on the ground in the vicinity of the crane, whose operator was John William Morello (hereinafter called "W. Morello"), also a Morello employee. Generally speaking, the overhead transmission line of Philadelphia Electric ran east and west, and the line of the ditch was approximately north and south. The boom of the crane operated by W. Morello came into such proximity to the lowest overhead transmission wire that, as a result, a current of electricity passed down the boom of the crane and thence to plaintiff's decedent, who was pronounced dead on arrival at Montgomery Hospital, Norristown, Pa. (N.T. 55–56).

The above-mentioned crane had been at this site since September 20, 1957, working off and on in the digging of the ditch (N.T. 80–82). The distance from the boom hinge to the end of the boom was approximately 25½ feet and the boom hinge was approximately 5 feet above the ground. The lowest transmission wire was approximately 26½ feet above the ground at the point near the ditch where strands of it were broken and scraped by contact with the crane boom on September 25, 1957[3] (see P–6A to P–6D, inclusive, P–10, P–12, P–13 and P–14). This wire carried 69,000 volts phase to phase and 40,000 volts phase to ground.

The decedent was a 32-year old crane operator in heavy construction work in September 1957 (N.T. 663, 670). He was an experienced crane operator (N.T. 1625) who had held this position at least since April 22, 1951 (N.T. 650 and 670). His qualifications as a crane operator were "the best" (N. T. 708).[4] On the morning of September 25, 1957, the decedent was instructed by the foreman, who believed there was power in the transmission lines (N.T. 697), to assist him in having W. Morello position the boom at a point where it was 15 to 18 feet above the ground (N.T. 711),[5] and W. Morello was told not to raise the boom any higher than this for the rest of the day (N.T. 704). Both W. Morello and the decedent were instructed that there was "power" in the transmission lines (N.T. 699–703).[6] All employees were instructed to keep away from this crane assigned to W. Morello while it was operating or they would be fired on the spot (N.T. 704–6).[7] However, it was

---

3. This portion of the wire was repaired on the day of the accident by employees of Philadelphia Electric Company and the section of the damaged wire was later (November 5) replaced.

4. The decedent was assigned on September 25, 1957, to another crane with a longer boom and a larger bucket than the crane operated by W. Morello, which crane the foreman had placed in a location south of, and about 200 feet away from, the high tension wires (N.T. 699, 710).

5. The decedent got in the cab of his crane to have a better perspective in estimating the maximum height of the boom as 6 to

10 feet below the transmission wires (N. T. 701–2, 704 & 711).

6. It is noted that the statement (PE–13A–1) signed by the foreman on September 26, 1957, states that both crane operators and himself agreed that the overhead wires carried at least 40,000 volts.

7. The statement of the foreman given on September 26, 1957, at which time he testified that his recollection would have been "much better" than it was at the time of trial (N.T. 2534), states "I * * * told all men on the job including both crane operators to stay at least 10 feet away from the crane" (PE–13A–1, N.T. 2489).

possible for W. Morello to raise the boom higher than this position 15 to 18 feet above the ground (N.T. 715) and, within two hours prior to the accident, W. Morello did raise the boom until it was sufficiently close to one of the overhead high tension wires (within four inches) that a small ball of fire (about the size of a volley ball or basketball) was formed and disappeared on the wires above the crane boom (N.T. 839, 850–1). At that time, the decedent warned W. Morello of the danger from the overhead wires (N. T. 839, 843).

R. Morello, the senior member of the Morello concern at the site on the early afternoon of September 25, 1957, came to the location of the crane assigned to W. Morello between 2:15 and 2:45 P.M. on the afternoon of September 25. He and the foreman authorized W. Morello to take his crane back to Bridgeport early that afternoon so that he could get through Norristown before the heavy traffic (N.T. 716, 718–9, 737–8). For a period of 15 minutes after R. Morello came to the site, W. Morello did not operate his crane (N.T. 716, 738). An undisclosed time after R. Morello left, W. Morello, the foreman, and the decedent, standing three or four feet to the rear of the crane, had a conversation during which it was suggested that W. Morello was the "pampered pet" because he was permitted to leave work early to go bowling (N.T. 707, 719). The foreman then left W. Morello and the decedent and crossed to the east side of the ditch in order to determine if one of the jackhammers was being used improperly (N.T. 719). After the foreman left, the decedent squatted near the ground, leaning against the tire of the rear wheel on the east side of the crane, and chatted with at least one of the ditch laborers as he passed (N.T. 2878, 2881 and 2882).

The crane operator, W. Morello, entered the house from which the boom is operated [8] (as opposed to the cab where the controls are located which move the wheels of the crane—N.T. 740–1, 1493, P–6C and P–8–9) and raised and swung the boom from the rear of the crane (where it was extending south, with the bucket on the ground where there was a spoil pile—N.T. 736, 741) toward the front of the crane (north) in order to place the bucket in the cradle (on the front of the chassis) in which it was normally stored when the crane was traveling (N.T. 195, 275–9, 298, 1514, P–8 and P–9). During this movement, the crane boom touched the lowest wire of the transmission lines. This occurred at least a minute after the foreman left the decedent and W. Morello (N.T. 707 and 2784 ff.). The electric current passed from the wire through the boom of the crane and thence to the decedent, who, being within four inches of the crane near its right rear wheel,[9] was fatally electrocuted by such current.

Decedent knew the lines were energized and that it was very dangerous to have the crane boom get within six feet of them (N.T. 699–702; cf. 2838–9).[10] He knew that, even though the crane operator (W.

8. N.T. 736–7 & 750; see, also, footnote 11 below.

9. Plaintiff's electrical expert conceded that certain weld spots near the right rear wheel of the crane were consistent with an arcing of electricity to a human being touching the ground and within four inches of the crane (N.T. 2850–1). Also, the police officer testified that the skin on the decedent's back came off when he turned his body over (N.T. 2384), which is consistent with his having leaned against the right rear wheel and his back being nearest the source of the electricity.

10. The foreman testified as follows concerning the decedent's part in placing the crane boom, on the morning of the accident, in a position where it would not be in proximity to the overhead wires:

"* * * I was on the ground, your

294

Morello) had been warned of this danger, he had already, on the afternoon of the accident, raised the crane boom within a few inches of the wires (N.T. 839, 843, 850–1). He had no responsibilities whatever in the vicinity of this crane and the overhead transmission line (see footnote 4 above and N.T. 2550–1).

The foregoing summary of the evidence provides ample support for the findings of the trial judge dated July 13, 1962 (Document 71). Comments on the testimony of certain witnesses discussed in plaintiff's brief have been placed in Exhibit A to this Memorandum Opinion in view of the length of the record in this case.

A. The findings of the trial judge were in accordance with the evidence and the law.

Since the plaintiff's brief (pp. 26–31) particularly challenges the action of the trial judge in rejecting these requests for findings of fact submitted by plaintiff (Document 66), the following comments on them may be helpful:

■ 14. This record has ample justification for a finding that defendant, through Mr. Bruns, repeatedly warned the decedent's employer of the danger incident to operation of cranes under these wires and the foreman of such employer warned the decedent of the danger created by the proximity of the crane to the wires on the very morning of the accident (see pp. 292, 293, above). The fact finder was fully justified in rejecting a finding that "defendant failed to give *any* adequate and specific warning * * * " (emphasis supplied).

24. The references to the record at pp. 5 & 7 above justified the fact finder

in finding that the crane operators were warned that there was "power" in the lines, the booms of the cranes should not be raised more than 15 to 18 feet above the ground, and it was dangerous for the booms to be within six feet of the overhead wires (N.T. 699–704, 711).

26. As pointed out in Exhibit A, the testimony of Gettis and Bruns is not consistent, so that the fact finder's mind could well have been in equilibrium or affirmatively not persuaded that this statement was more probable than not.

27. The evidence that Bruns was at the rear of, and within 10 feet of, the crane within a period of approximately 15 minutes before the accident is not persuasive, so that the rest of this request need not be discussed.[10a]

28. If the word "some" had been placed before "men," this request would undoubtedly have had more chance of acceptance. It is clear that some of the men working in the ditch were more than 10 feet from the crane (N.T. 2538, 2908, 2957). However, even with this change in the request, there is doubt as to how close the men working in the ditch nearest to the crane were to the crane. The fact finder may well have accepted Jackson's testimony that Mr. Gettis was 15 feet from the crane at the time of the accident and rejected the testimony of Mr. Gettis indicating that men were within 10 feet of the crane at the time of the accident. Jackson testified that the men were as far from the crane as counsel for plaintiff's chair at the counsel table in Court Room 1 is from the witness chair (N.T. 2953), which distance is over 17 feet.

■ 29 & 30. There is substantial evidence to support a finding by the fact

Honor, and I couldn't determine the height as well as what Phillip could on the cab. That is one of the reasons why I had Phillip determine the height the boom should be raised to; *also the fact that he was a crane operator and understood this*" (N.T. 702; emphasis added).

10a. Due to the reference in this request to the 15-minute period prior to the accident

mentioned in 26 and the fact finder's finding that Bruns was not necessarily at the crane during this period and that his conversation with decedent took place prior to it, the testimony at N.T. 1053 & 1072, relied on at p. 27 of plaintiff's brief, is not inconsistent with the denial of Request 27. It is quite possible that various conversations concerning the leaving of W. Morello for Bridgeport took place over a period of a half hour or even more.

finder that the decedent, having seen W. Morello raise the boom to within a few inches of the overhead wire within two hours of the accident, knowing that he was in a hurry to get his mobile crane back to Bridgeport,[11] and knowing that the boom had to be swung to the other end of the truck chassis and the bucket had to be placed in the cradle before the mobile crane could be taken on the roads to Bridgeport, should reasonably have foreseen that the boom of the crane might be moved by W. Morello while the crane was under the high tension wires. There was no assurance in this case that the next indicated move of W. Morello, in view of his past conduct and his statement that he was going to leave the site "as quick as I can," [12] was not exactly what he did in fact do; namely, raise the boom and swing it to the east of the crane chassis in order to put the boom in position for over-the-road travel and to place the bucket in the cradle. The fact finder was not bound to accept the conclusion of the foreman (Mr. Gettis), who had not yet completed his first full day on the job, as to what this move was. The case of Getz v. Freed, 377 Pa. 480, 105 A.2d 102 (1954), is clearly distinguishable, since the rules of golf prescribed what the next indicated move of the golfer was in that case and there was no past history of the golf player having broken such rules.

■ 33. There is substantial evidence to support a finding that the raising and swinging of the boom in order to lift the bucket and swing it in a position above its cradle was a probable procedure which might be followed by W. Morello (N.T. 276–7). See, also, comment under Requests 29 and 30 above. This request involves a conclusion of law, since it states that defendant has a certain burden of proof. Defendant need not prove that plaintiff should necessarily anticipate the exact risk which occurs. Even if anticipation of such exact risk were required, there is substantial evidence in this record to justify the finding of the fact finder that decedent should have anticipated the exact action taken by W. Morello at the time of the accident, namely, the raising of the boom and the swinging of the bucket to the cradle at the front of the crane, with the probability that the boom would be energized by electricity from the overhead wire. However, it is enough if plaintiff places himself, as he did clearly in this case, in a position of danger where there was no necessity for him to have been. See Dezelan v. Duquesne Light Co., 334 Pa. 246, 248–250, 5 A.2d 552 (1939); Szanborsky v. Armour & Co., 306 Pa. 525, 160 A. 219 (1932).

34. The fact finder was justified in finding that the decedent was leaning against the tire of the right rear wheel of the crane at the time that the electricity passed from overhead high transmission wires to the boom of the crane and that this involved placing himself in a position of danger in view of several possibilities of action which might be taken by the crane operator, under all the circumstances presented by the record. Some of the pertinent circumstances include, but are not limited to: the presence of the bucket on the spoil pile, the location of the cradle for the bucket on the front of the crane; the inability to swing the boom into its over-the-road position from the cab where the controls for moving the wheels were located; the necessity of being in the cab in order to operate the wheels of the crane; the knowledge that the crane operator was in a hurry to leave the site,

11. The decedent knew that moving the crane from under the wires before placing the boom in position for the trip to Bridgeport would require W. Morello to enter the cab to move the crane from under the wires, then enter the house to move the boom and bucket, and finally re-enter the cab, whereas only one trip to the cab would be required if W. Morello entered the house first and moved the boom and bucket while the crane was still under the high tension wires and then entered the cab for the drive to Bridgeport.

12. "I am going to try to get out of here as quick as I can so I can avoid the Norristown traffic" (N.T. 800; see, also, N.T. 716, 718–9 and 737–8).

that he had earlier that afternoon raised the boom to a point so close to the transmission wire that a ball of flame had been created, and that a possible method of placing the bucket in the cradle (where it would be ready for over-the-road travel) would be to raise and swing the boom from the rear to the front in order to get the bucket positioned in its cradle. Also, the fact finder was entitled to find that the decedent, an experienced and able crane operator, should have anticipated the possibility that, under facts supported by evidence which the fact finder had the right to accept, W. Morello would enter the house of the crane first in order to operate the boom so that it and the bucket would be in their over-the-road positions before entering the cab and moving the crane from under the wires in order to avoid making a third move, which would have been required if W. Morello had entered the cab first and moved the crane from under the wires before moving the boom. The fact finder had the right to reject the opinion of the foreman that the next indicated move of W. Morello in this situation was to drive the crane out from beneath the wires without raising the boom.[13]

The Pennsylvania Supreme Court has repeatedly and recently emphasized that all persons with "the slightest mentality" know the "vast potentialities for destruction of electricity." See Cooper v. Heintz Mfg. Co., 385 Pa. 296, 304, 122 A.2d 699 (1956). Cf. MacDougall v. Pennsylvania Power & Light Co., 311 Pa. 387, 396–397, 166 A. 589 (1933). This exposing of himself to danger by squatting with his back against the tire exposed him to at least two risks, namely, the risk from electricity and the danger from the wheels if the crane was moved.

 Under Pennsylvania law, a person who places himself in a position of danger where he is not required to be for his work or other reasons [14] is contributorily negligent.[15] See cases cited at page 12 above; Commonwealth Trust Co. of Pittsburgh v. Carnegie-Illinois Steel, 353 Pa. 150, 154–156, 44 A.2d 594 (1945); cf. McNello v. John B. Kelly, Inc., 283 F.2d 96, 100 (3rd Cir. 1960), stating that a person is contributorily negligent "if he falls victim to one of those dangers that should have made him eschew the course which he followed." In the Commonwealth Trust Co. of Pittsburgh case, a decedent who had directed the boom operator to swing the boom to a point dangerously near the high tension wires and then placed his hand on the bucket was held to be contributorily negligent as a matter of law. The finding of the trial judge that the decedent was negligent and that such negligence contributed in some degree to the accident was clearly supported by substantial evidence.[16]

13. See Exhibit A.

14. Cases such as McNello, supra. Stark v. Lehigh Foundries, Inc., 388 Pa. 1, 130 A.2d 123 (1957), and Gregorius v. Safeway Steel Scaffolds Co., 409 Pa. 578, 187 A.2d 646 (1963), relied on by plaintiff, involved situations where the plaintiff's work required him to be in a position of danger, whereas in this case the testimony of plaintiff's witness was that he had no responsibilities near the crane assigned to W. Morello and the overhead transmission line (see page 294 above). In the Stark case, the court also pointed out that the plaintiff did not know of the potential danger. Even where the plaintiff's work requires him to occupy a position of danger, the Gregorius case, supra, 409 Pa. at p. 584, 187 A. at p. 649, quotes Van Zandt v. Philadelphia B. & W. R. R. Co., 248 Pa. 276, 281, 93 A. 1010, 1011 (1915), as follows: " 'He knows he is occupying a place of great danger, and his care must be commensurate with that danger.' "

15. The Government consistently contended that the decedent was contributorily negligent for this reason. See Answer and the following statement in the Government's pre-trial memorandum (Document 10) : "The government contends that the plaintiff's decedent, Phillip P. Morello, was guilty of contributory negligence in that he had been warned by his foreman of the danger and in view of his experience, he was bound to realize that the crane was potentially dangerous to him if charged with electricity. In spite of the above, he placed himself in a position of danger and peril."

16. It is also noted that the Gregorius case, supra, the cases cited in that case (Scho-

Decedent placed himself in a place of danger completely unnecessarily and a primary source of danger was the electricity from the overhead high voltage transmission wires and the crane (including its boom), of which dangerous electricity the fact finder was amply justified in finding he was well aware. The possibility that he might be injured by the wheels of the crane was not the sole danger of which he was aware.

Under Pennsylvania law, a plaintiff cannot recover if he is negligent and his negligence contributed in any degree to the injury or death. Middleton v. Glenn, 393 Pa. 360, 363, 143 A.2d 14 (1958); Crane v. Neal, 389 Pa. 329, 332–333, 132 A.2d 675 (1957); McFadden v. Pennzoil Company, 341 Pa. 433, 436, 19 A.2d 370 (1941).[17] However, in order to be considered as having contributed to the occurrence, the injured man's negligence must have been a juridical cause of the injury and not simply a condition of its occurrence. Geelen v. Pennsylvania R. R. Co., 400 Pa. 240, 248, 161 A. 2d 595 (1960); McFadden v. Pennzoil Company, supra, 341 Pa. at pp. 436–437, 19 A.2d at p. 372. The United States Court of Appeals for the Third Circuit has stated recently:

"Even though a man chooses an unsafe course he is not barred from recovery for any accident that may occur and he may only be held guilty of contributory negligence if he falls victim to one of those dangers that should have made him eschew the course which he followed." McNello v. John B. Kelly, Inc., 283 F.2d 96, 100 (3rd Cir. 1960).[18]

In this case, the negligence of the decedent in taking his position against the right rear tire of the crane was a juridical cause of his death because the danger of being injured through electrical power can reasonably be considered as having been included in the risks to which his position exposed him. There was substantial evidence to support the finding that the plaintiff's decedent was negligent and that his negligence contributed to, and was a juridical cause of, his death and that the contributory negligence of the decedent barred plaintiff's recovery in this action.

The Pennsylvania appellate courts have repeatedly made clear that whenever there is conflicting evidence on the issue of contributory negligence, the findings of the fact finder must control. Polinelli v. Union Supply Co., 403 Pa. 547, 552, 170 A.2d 351 (1961); Smith v. Wheatland Tube Co., 401 Pa. 427, 165 A.2d 76 (1960); Greco v. 7-Up Bottling Co. of Pittsburgh, 401 Pa. 434, 446, 165 A.2d 5 (1960); Butterman v. McClintic-Marshall Const. Co., 206 Pa.

field [Schofield v. Druschel, 359 Pa. 630, 59 A.2d 919], Fleischman [Fleischman v. City of Reading, 388 Pa. 183, 130 A.2d 429] and Mutter [Mutter v. Slaymaker, 404 Pa. 369, 171 A.2d 779]), and other cases relied on by plaintiff, such as Holton v. Gibson, 402 Pa. 37, 42, 166 A.2d 4 (1960), hold that it is error to find as a matter of law that the failure to guard against lack of ordinary care on the part of another constitutes contributory negligence. This rule does not, however, in any way preclude a jury (or, as here, the court sitting as fact finder) from concluding that, as a matter of fact, plaintiff was contributorily negligent, even if it were not shown that plaintiff should reasonably have anticipated every incident which occurred.

17. In Crane v. Neal, supra, the Supreme Court held that it was reversible error

for the trial judge to charge the jury that negligence on the part of the plaintiff would not bar recovery unless it was a proximate cause of the accident.

18. See, also, McFadden v. Pennzoil Company, supra, where the court states at pp. 436–437 of 341 Pa., at p. 372 of 19 A. 2d:
"* * * where a person unnecessarily assumes a dangerous position upon a moving vehicle and, *by reason of such position*, sustains injuries, ordinarily there can be no recovery therefor, the injured person's position in itself being a contributing cause, it is equally clear that the rule is applicable to defeat a recovery only where the negligence or misconduct of which the injured party was the victim can reasonably be considered as having been included in the risks to which his position exposed him."

82, 86, 55 A. 839 (1903). In Polinelli, supra, the court said at p. 552 of 403 Pa., at p. 354 of 170 A.2d:

" * * * this is a case where reasonable minded individuals would disagree as to whether or not she was guilty of negligence which contributed to her fall. Under such circumstances, the jury must answer this question. * * * "

In Butterman, supra, the appellate court affirmed, per curiam, the opinion of the trial court, which contained this language at p. 86 of 206 Pa., at 840 of 55 A.:

"(3) Butterman's contributory negligence. Defendants' contention is that Butterman, being at a place of safety, voluntarily placed himself in a place of danger.

"The evidence as to Butterman's position when the collision became inevitable was conflicting, and therefore had to be submitted to the jury."

 In Pennsylvania law, there is a legal presumption that a decedent was exercising due care at the time of the occurrence causing his death. Fris-

ina v. Dailey, 395 Pa. 280, 285, 150 A.2d 348 (1959); Michener v. Lewis, 314 Pa. 156, 158–159, 170 A. 272 (1934). Where, as in this case, the presumption is rebuttable and substantial evidence of lack of due care on the part of decedent is offered during the trial, it is for the fact finder to decide whether decedent has been contributorily negligent. See Lear v. Shirk's Motor Express Corp., 397 Pa. 144, 149, 152 A.2d 883 (1959). As pointed out at page "d" of the Opinion of July 13, 1962 (Document 71), such evidence was not produced in Keasey v. Pittsburgh & Lake Erie R. R. Co., 404 Pa. 63, 170 A.2d 328 (1961), relied on by plaintiff at p. 33 of her brief; hence, that case is not applicable to the record in this case.[19] Also, as stated by the trial judge at page "d" of the Opinion of July 13, 1962, the presumption and the probabilities underlying its creation were considered by the fact finder together with all the evidence in the case, in accordance with the ruling of the United States Court of Appeals for the Third Circuit in Johnstone v. Reading Company, 248 F.2d 71, 74 (3rd Cir. 1957).[20]

B. Alleged errors in rulings on admissions and exclusion of evidence.[21]

19. It is noted that the plaintiff objected to the non-affirmance of the trial judge of her requested conclusion of law No. 13, which read as follows:
"Plaintiff's decedent is entitled to the benefits of the presumption of due care, which means that every rule that one can conceive which is designed to protect and preserve human life is presumed to have been respected by plaintiff's decedent."
This statement, which the court found confusing, should not have been made a conclusion of law in a case such as this. The issue as to whether or not the decedent was contributorily negligent so as to bar plaintiff's recovery was, in this case, one for the fact finder. See Frisina v. Dailey, 395 Pa. 280, 285, 150 A.2d 348 (1959); Rutovitsky v. Magliocco, 394 Pa. 387, 389, 147 A.2d 153 (1959); Waugh v. Commonwealth, 394 Pa. 166, 173–174, 146 A.2d 297 (1958). The Keasey case, supra, is not contrary. In that case, it was held that the defendant

could not ask for judgment n. o. v. in the absence of a mortal infirmity in the plaintiff's case because the presumption of care accorded to a decedent is enough in itself to negate contributory negligence unless of course it is overcome by substantive evidence. See 404 Pa. p. 68, 170 A.2d p. 330 of that opinion.

20. Note, also, the language of the Pennsylvania Supreme Court in Stark v. Fullerton Trucking Co., 318 Pa. 541, 544, 179 A. 84 (1935), where the court said that the presumption of due care has no existence as against the certainty that if decedent had taken all necessary precaution for his safety he would not have died.

21. Several matters bearing on such errors are referred to below, such as the refusal of the trial judge to permit the foreman to testify to his conclusion that he would have seen a ball of fire or heard a popping sound if it had taken place. See footnote 4 of Exhibit A.

## 1. Testimony of Mr. Van Name

Mr. Van Name, an electrical expert, was called by plaintiff in her jury trial case against Philadelphia Electric as a hostile witness under F.R.Civ.P. 43(b). He was questioned about distances, etc., which he had observed shortly after the accident and, during his testimony, plaintiff introduced certain exhibits, including P–6C, a chart of the scene of the accident prepared by Mr. Van Name.

During the cross-examination by defendant Philadelphia Electric Company, Van Name indicated that, at the time of the accident, the decedent was not more than four inches from the crane or he would not have been electrocuted (N.T. 191). No objection was made to this testimony, which plaintiff overlooks in her lengthy argument on this subject (pp. 54–63 of her brief).[22] During cross-examination by Mr. Ryan, Mr. Van Name stated that in his opinion the decedent would have had to have been closer than four inches from the crane to be electrocuted (see N.T. 221–4) and also stated that he had indicated on Exhibit P–6C where decedent was at the time of contact. Plaintiff's objection to that question was overruled because the witness had answered it prior to the objection (N.T. 225).

On re-direct, plaintiff's counsel questioned Van Name as to whether one more than four inches from the crane could have gotten a sufficient shock to cause him to lose his balance or possibly fall against the equipment (N.T. 286), as well as questioning him on P–6C (N.T. 287–8).

On re-cross, Van Name again said that decedent would have had to be within four inches of the crane at the time the electricity passed through it in order to be electrocuted (N.T. 313–4) and further said that the decedent would have had to have been within 0 to four inches of

the crane to suffer an injury from electricity (N.T. 418–20). On additional redirect by plaintiff, Mr. Van Name stated that, in his experience, one could not have gotten a shock if he were more than four inches from the crane, and added that he was not an expert as to that (N.T. 432). Thereafter, when he attempted to "refresh the recollection" of the witness with a prior statement, an objection to such procedure was sustained (see pp. 443–5). This ruling was later reaffirmed (N.T. 543–4). It is noted that counsel for plaintiff stated that the exact distance of the decedent from the crane at the time of the accident was not significant and that his position is that matters as to which the burden of proof was on defendant were being injected into plaintiff's case beyond the scope of the witness' direct testimony. He also stated that he made no objection to the distance question when asked by Philadelphia Electric's counsel because he thought it would be termed within the scope of cross-examination (see N.T. 546–9).

██ The rulings as to the testimony of Van Name were not erroneous. Plaintiff questioned him concerning the accident site. When defendant Philadelphia Electric Company asked him a question relating to the grounding device about which he testified on direct and which resulted in a statement (N.T. 191) which led to the further questioning of the other defendants, no objection was made. Thereafter, plaintiff could not object to cross-examination by others on this point.

██ The witness testified as to some facts known to him concerning the accident and it was proper for him to be cross-examined as to other relevant and material facts on the same issue. See Sierocinski v. E. I. du Pont de Nemours & Co., 118 F.2d 531, 536 (3rd Cir. 1941).[23]

---

22. The testimony that electricity could arc four inches came into the record as to plaintiff without her objection at that point, so that it is difficult to understand plaintiff's lengthy objection to Mr. Van Name's testimony on this subject.

23. Plaintiff relies on Okotkewicz v. Pittsburgh Rwys. Co., 397 Pa. 303, 306, 155

In addition, plaintiff, on re-direct, asked questions concerning this matter (e. g., 286–8) which gave the witness an opportunity to reaffirm his "less than four inch" opinion (e. g., N.T. 313–4, 418–20). See, also, N.T. 432. Counsel for plaintiff stated to the court at N.T. 546 that the exact distance of the decedent from the crane was not "of any significance."

█ The alleged error is mainly based on the ruling that plaintiff was precluded from attempting to "refresh the recollection" of the witness with a prior statement which was not inconsistent [24] with an answer already given. Under the circumstances of this case, including the above-mentioned factors and the court's statement that Van Name could be called as a witness by plaintiff in the non-jury case, there was no reversible error. See F.R.Civ.P. 60.

2. *Testimony of Mr. H. Jackson*

█ Jackson's testimony was admissible for these reasons, among others:
a. It was admissible evidence in the interests of justice as an aid in securing the truth.

On the 16th day of the trial (the offering of evidence was completed on the 18th day), Jackson was called (N.T. 2876) by defendant as a disinterested witness who would testify exactly where the decedent was located in relation to the crane (in a squatting position leaning against the right rear wheel) 15 to 20 seconds before the accident and also that the decedent had been in this position for some time (over a minute) prior to the accident. The plaintiff had offered no testimony in her case of a witness testifying as to the decedent's position at or near the time of the accident and neither plaintiff nor defendant had offered the testimony of the crane operator concerning what he had been doing at the time of the accident.[25] Although a witness called by the defendant (the foreman) had testified on cross-examination that decedent was several feet to the rear of the crane either a minute or 30 seconds before the accident and two to four feet to its rear when the blue flame caused by electricity enveloped him after the contact of the boom with the wire, this witness had his back turned to the crane at the time of the accident. Under these circumstances, it was in the interests of justice for the trial judge to hear the testimony of this witness when it was first offered by the defendant. This was particularly true in view of the fact that no surprise was involved for plaintiff, since the witness was listed in the plaintiff's pre-trial memorandum, which had a letter attached to it showing that the plaintiff had a statement from this witness (see Document 39 in C.A. 25328).[26] Casey v.

---

A.2d 192 (1959), but in that case there was a timely objection, which was not made in this case when this subject was first introduced at N.T. 191.

24. Counsel for plaintiff stated that he was not attempting to impeach the witness, so any argument as to whether he could or could not impeach him is not in order.

25. In view of the following the trial judge did not feel it was fair to W. Morello to examine this crane operator on his version of what occurred at the time of the accident when he was called by counsel for third-party defendant Morello (N.T. 1619), who did not question him on this subject and objected to such examination by the cross-claim defendant, Philadelphia Electric Company (N.T. 1624):

A. There had been marked for identification prior to the calling of the crane operator (W. Morello) a statement from an investigator's report that this operator had been in a state of shock due to his participation in the accident which caused his brother's death (M–8A; N.T. 1515).

B. The trial judge knew that the case had been continued on the trial calendar at least once in 1962 due to some illness of W. Morello.

C. Neither plaintiff nor defendant had called this crane operator in their cases.

D. The counsel for his employers (his brothers) did not question him on this subject.

26. The testimony that the decedent was leaning against the crane had been related to a representative of defendant, who had interviewed Jackson in June 1961. See

Seas Shipping Co., 178 F.2d 360, 362 (2nd Cir. 1949); National Surety Corporation v. Heinbokel, 154 F.2d 266, 268–269 (3rd Cir. 1946); United States v. Savannah Shipyards, 139 F.2d 953, 956 (5th Cir. 1944), rehearing denied, 140 F.2d 863 (5th Cir. 1944); Chalmette Petroleum Corp. v. Chalmette Oil Distributing Co., 143 F.2d 826, 829 (5th Cir. 1944); Friend v. Commissioner of Internal Revenue, 102 F.2d 153, 155 (7th Cir. 1939). See, also 88 C.J.S. Trial § 103, p. 217.

 b. It was proper surrebuttal of evidence offered after the close of defendant's case.

This evidence was proper surrebuttal of the following points injected in the trial after the defendant rested (N.T. 1386):

i. Plaintiff had offered in rebuttal testimony of the foreman (N.T. 2426 ff.) that was different from that he had given when previously testifying to the events immediately before and at the time of the accident (N.T. 693 ff.). This rebuttal testimony indicated that there were only 20–30 seconds [27] between the time the foreman left the decedent and the time of the accident (N.T. 2431) and that the foreman was the first person to get to the decedent after the accident. The testimony of Jackson was proper surrebuttal of this testimony.[28]

ii. In her rebuttal evidence, plaintiff submitted evidence of Gettis that decedent was two to four feet behind the crane at the time of the accident [29] and expert electrical testimony to show that the decedent could have been electrocuted even though he was several feet (including two to five feet) from the crane through a so-called "Jacob's ladder" effect of the electricity (N.T. 2660 ff.). Defendant was entitled to reply to this by offering the evidence presented by Jackson that defendant was, in fact, leaning against the tire of the rear left wheel of the crane and within four inches of the crane. This had been unnecessary in defendant's initial case, since one of plaintiff's witnesses (Van Name) had testified that a person could not have been electrocuted unless he was within four inches of the crane. The possibility that the decedent was within four inches of the crane but not touching it was also recognized by plaintiff's electrical expert as consistent with the facts and not requiring electrocution by "Jacob's ladder" (N.T. 2799–2800). Jackson's testimony supported this possibility.

iii. Third-party defendant Morello introduced testimony in its case indicating that certain burn marks on the crane, which the fact finder could have inferred were in the shape of a hand, were on the right rear of the crane (N.T. 1469).[30] This witness indicated that the defendant was leaning against the tire of the wheel, thereby tending to rebut the inference that decedent was physically in contact with the metal portion of the crane at its right rear by having his hand at that spot, which inference had been injected into the case by the above-mentioned third-party defendant. This testimony of A. T. Morello (N.T. 1469) and the inferences to be drawn from it may well have been considered by defendant as less consistent with its contentions as to the happening of the accident than the testimony given by Jackson.

___

Exhibit G–8A. Jackson's testimony was also consistent with testimony of plaintiff's expert on electricity (N.T. 2784, 2785).

27. Previously, he had testified that this interval was about one minute (N.T. 707).

28. Jackson's testimony indicated that decedent was leaning against the tire for longer than a minute and that W. Morello and Jackson were the first persons to reach the decedent after the accident.

29. At N.T. 2398, plaintiff took the position that decedent was four to five feet from the crane.

30. Although one of defendant's witnesses had testified that there were burn marks in the shape of a hand on one of the rear fenders of the crane (N.T. 1110–3), he could not remember on which side or where at the rear of the crane such marks were (N.T. 1130, 1156).

c. There was no change in the defendant's position involved in Jackson's testimony.[31]

As pointed out above at page 14, the defendant has continuously during this suit included contributory negligence as one of its defenses, as contended in its pre-trial memorandum and not as stated at page V of plaintiff's brief.[32] Counsel for the defendant made clear at the time of the testimony concerning the marks in the shape of a hand, described in footnote 30 above, that he had only learned on that day that this was part of the witness' observation after the accident (N. T. 1138) and that the witness had been asked to come to court to testify in the case for another purpose. Also, since defendant had a previous statement of Jackson, which it may be inferred was consistent with his testimony in view of the fact that plaintiff's counsel did not confront Jackson with it during the trial,[33] there seems to be no basis whatever for plaintiff's claim of surprise in regard to Jackson's testimony.

3. *Testimony of Officer Krupiewski*

■ The testimony of the police officer from his report and as to the source of that part of the report (N.T. 1811–3 and 1828–9) was properly admitted as evidence to impeach the previous testimony of Mr. Bill that he had never expressed to such officer an opinion that the decedent was leaning against the mobile crane at the time of the accident (N.T. 1722–4). See Headen v. Pope & Talbot, Incorporated, 252 F.2d 739, 744 (3rd Cir. 1958). Since the fact finder did not rely on the testimony of Mr. Bill in reaching his conclusion of contributory negligence and clearly did not rely on this impeaching evidence of Officer Krupiewski, which was not substantive evidence, any error in the ruling complained of at pp. 39–42 of plaintiff's brief (N.T. 1811–2)[34] was harmless. See F.R.Civ.P. 60.

The many other complaints of plaintiff concerning rulings on evidence do not require comment.[35]

At the start of the trial, plaintiff's counsel made clear that he was calling witnesses for limited purposes and he wanted to have the cross-examination limited to the scope of the direct (e. g., N.T. 221–3, 232). His objections to questions on cross-examination were sustained on several occasions on this basis (e. g., N.T. 341, 417, 451, 453). It was only fair that his adversaries be given the corresponding right to insist that plaintiff's cross-examination be limited to the scope of their direct examination and her rebuttal evidence be re-

---

31. This point is mentioned in view of statements in plaintiff's brief that Jackson's testimony introduced "an entirely new defense" (p. VI).

32. Contrary to the implication at p. V of plaintiff's brief, A. T. Morello was not called as a witness by defendant in its case.

33. See letter of 4/5/62 attached to plaintiff's pre-trial memorandum (Document 39 in C.A. 25328). Also, it is noted that Jackson was included as a potential witness at page 4 of plaintiff's pre-trial memorandum (Document 39 in C.A. 25328).

34. It is noted that plaintiff relies on parts of the record (N.T. 1828 & 1822) after the alleged erroneous ruling to show facts allegedly making the ruling incorrect.

35. The issue of contributory negligence does not rest on the foreman's conclusion on violation of a 10-foot rule, as expressed by him at the trial (as noted above at p. 5 (fn. 7), his statement of that rule in PE–13A–1 in September 1957 differed from his statement of the rule at the trial) but on whether a skilled crane operator, with normal vision and knowledge shown by the record, was exercising reasonable care for his own safety in leaning against the tire of, or being within four inches of, the rear wheel of the crane at the time of the accident. Similarly, it was clear that laborers working in the ditch could not have been in violation of a 10-foot rule since these men knew the crane was not being used at that time and, unlike the decedent, they had no reason to know that W. Morello was in a hurry to get to Bridgeport, as they had not heard the conversation at the rear of the crane. The fact finder has made no finding that decedent was standing with his hand on the crane at the time of the accident, so that any error in excluding evidence on that point was, at the most, harmless. See F.R.Civ.P. 60.

stricted to subjects relevant as rebuttal to material placed in the record after the close of plaintiff's case. Also, it is noted that several of the rulings complained of by plaintiff in her brief (pp. 66–76) were made during the lengthy (51 minutes—N.T. 2616) redirect examination of the foreman the second time this witness was called by plaintiff's counsel to the stand, when he was anxiously trying to get transportation back to the place of his employment in Maryland after spending many days testifying and waiting to testify in this case.[36] The trial judge felt it necessary to put some limitations on counsel for plaintiff's prolonged redirect examination of this witness so that there might be some short time available for recross-examination and still enable the witness to secure his transportation on June 14.

 Counsel for plaintiff's claims of over-participation and improper partisanship by the trial judge have been carefully considered and form no proper basis for grant of a new trial after consideration of the record as a whole.[37] Counsel for plaintiff has chosen to overlook the many rulings of the trial judge which exhibited assistance to such counsel in giving him every opportunity to present all relevant evidence in support of his client's case.[38]

36. The foreman had been present in the court room under subpoena for many days prior to June 13 (see, for example, N.T. 425–7, 752–4, 766–7) when counsel for plaintiff called him to the stand for a second time in rebuttal, with the understanding that his testimony would be concluded that day (N.T. 2501 & 2506). It proved necessary for him to remain in Philadelphia overnight and he changed his arrangements to return to his job on the afternoon of June 14 (N.T. 2627).

37. In addition to the many rulings for plaintiff set forth in footnote 38, which is far from a complete list, the trial judge gave counsel for plaintiff a vast amount of time to present his arguments, as well as his evidence. [At p. 20 of Morello's brief, it is stated that "exclusive of his questioning of witnesses, the record contains no less than 2,700 lines representing statements made by (counsel for plaintiff) during the course of the trial. This represents four per cent of the record."] For example, at N.T. 2476–9, counsel for plaintiff argued that he should not be required to produce P–26 and yet, when the trial judge ruled in his favor at N.T. 2479, he immediately withdrew his objection and voluntarily made the document available (N.T. 2479). Morello's brief (at p. 19) makes this comment on these claims of counsel for plaintiff:

"It is submitted that this allegation simply adds another party to the long list of those who have been castigated by the plaintiff's attorney during the course of this long and bitterly contested law suit. At one time or another, each attorney in the case, with the exception of Mr. McDevitt, has been castigated by (counsel for plaintiff) * * *."

Some of these attacks by counsel for plaintiff on his adversaries are at N.T. 328 ff., 387, 392, 1527, 2419, 2420 and 2561. At N.T. 1527, counsel for plaintiff attacked counsel for Morello as "going pretty far just to make an impression in this court room" for a statement which had not been made by counsel for Morello but had been made by Mr. McDevitt, whose contentions had been in accord with counsel for plaintiff's throughout most of the trial.

38. Some examples of rulings in favor of plaintiff are: N.T. 380 (refusal to direct a verdict for defendant Philadelphia Electric Company at the conclusion of plaintiff's case, even though plaintiff's counsel conceded such case was weak— N.T. 379), N.T. 2646–2658 (attempts of trial judge to assist counsel for plaintiff in framing a hypothetical question for his electrical expert), N.T. 851–9 (delay of cross-examination of witness at request of counsel for plaintiff), N.T. 2618 (volunteered action to prevent opposing counsel from arguing with plaintiff's witness), N.T. 2548–9 (attempt to help plaintiff's witness make his testimony clear), N.T. 2873 (grant of counsel for plaintiff's request that defendant be required to start with an important witness after 3:30 P.M., thereby depriving defendant's counsel of the opportunity to talk to the witness that evening), N.T. 2398–2424 (liberality in permitting counsel for plaintiff to call rebuttal witnesses over the strenuous objection of his adversaries), and N.T. 2952, 162, 167, 235, 243, 286, 301, 304, 417, 702, 1369, 1828, 2492, 2512, 2543, 2959, 2987, 3017, 3020, 3024 and 3042, being rulings noted in examining the record in considering plaintiff's contentions but which are not at all a complete list of rulings favoring plain-

As recently so well stated by Judge Joseph S. Lord, III, in Van Der Schelling v. U. S. News & World Report, Inc., D.C., 213 F.Supp. 756:

> "My determination of the law, however, can be guided only by what I think it is and not by external motives. ' * * * But motives of commiseration, from whatever source they flow, must not mingle in the administration of justice. Judges, in the exercise of their functions, have frequent occasion to exclaim, "durum valde durum,. sed sic lex est." * * *': Penhallow, et al. v. Doane's, Adm'rs, 3 U.S. (Dall.) 54, 1 L.Ed. 507 (1795)."

For the foregoing reasons, plaintiff's MOTION FOR NEW TRIAL must be denied.[39]

### Motion For Additional Findings Under Rule 52 and To Alter or Amend Judgment (Document 77)

All counsel agreed (see letters in envelope marked C–1) [40] to waive the filing of special findings of fact by the trial judge after it had been pointed out to them (N.T. 552) that the parties had "the right to require" the trial judge "to make specific findings." (See F.R. Civ.P. 52.) For this reason, the trial judge made a general finding for defendant, with limited explanation, and rulings on requests for specific findings by the parties (Documents Nos. 66, 72–74) in an opinion of July 13, 1962 (Document 71), which was prepared and executed within 48 hours after counsel had presented, at their request, argument in support of their positions on July 12, 1962. After the case had been decided against plaintiff, her counsel filed the above Motion (Document 77), asking for more findings in addition to those agreed upon during the trial. If the trial judge made such additional findings, it would be in violation of the arrangement made with the other parties and the undersigned believes plaintiff is ' estopped to make such a request. For this reason, this Motion will be denied. However, in case the trial judge is incorrect in this view, he makes the following comments on the numbered paragraphs of this motion:

> In view of the finding of contributory negligence, 1 is moot.

---

tiff. Also, the trial judge sustains plaintiff's objection (N.T. 2253–5) to paragraph 5 of M–6 (see, also, M–14A and P–21), which would have virtually eliminated the wife-plaintiff's claim, this being clearly the most substantial claim.

39. Although plaintiff apparently takes the position in her brief that objections or motions made by third-party defendants during the trial cannot affect the principal action unless defendant specifically joined in such objections or motions, the United States Court of Appeals has indicated that such a repetitive procedure is unnecessary. See Hennessey v. Securities and Exchange Commission, 285 F.2d 511, 516 (3rd Cir. 1961) ; cf. Weitort v. A. H. Bull & Company, 192 F.Supp. 165, 168–170 (E.D.Pa.1961). Furthermore, counsel for the defendant made clear during the trial that he did not believe it was necessary to make any such objections where other counsel had made them (N. T. 1487) and, as far as the court has been able to ascertain, counsel for plaintiff did not indicate the position apparently taken in his brief (for example, pp. 71, 73), that defendant had to specifically join in the third-party defendants' objections

if they were to affect the principal action, until the next-to-the-last day of the trial (N.T. 3004), at which time plaintiff's position, as apparently taken in his brief, was not made crystal clear.

40. A letter of June 18 from the trial judge contained this language:

> "At N.T. 34–36 and 552–555, I pointed out that I would hand down my findings in the above case within 48 hours after the completion of the taking of testimony if all counsel waived the filing by me of special findings of fact, * * *."

Counsel for plaintiff sent a letter of June 29 to the trial judge, the first sentence of which stated:

> "In response to your letter of June 18 to all counsel in the above matter, kindly be advised that plaintiff is agreeable to the waiver of the filing by you of special findings of fact, on the understanding that I may submit requests for findings of fact and conclusions of law in the nature of points for charge on which requests your Honor will, of course, rule." (Such rulings are in Document 71).

As to 2–8, there is some evidence from which a fact finder could infer that the decedent may have known, or should have known, some of the facts stated in these requests. The decedent was an experienced crane operator, with no impairment of vision, who knew his brother was going to move the Michigan truck crane to Bridgeport promptly and he should have observed where his brother was going to move the crane and boom or stayed many feet from it, since he had no duties requiring him to remain near the crane.

9, 11, 14, 24, and 31 would be affirmed.

10,[41] 12, 13,[42] 15–23 and 25–30 would be denied. Many of these requests are based on the foreman's testimony and the fact finder is not bound to accept this testimony in view of the references to the record in Exhibit A and in the foregoing Memorandum Opinion.

There are also attached letters from counsel dated March 8 and 12, 1963, submitting additional authorities.[43]

## ORDER

AND NOW, March 21, 1963, IT IS ORDERED that the following Motions of plaintiff are DENIED:

(a) MOTION FOR NEW TRIAL UNDER RULE 59 (Document 76); and

(b) MOTION FOR ADDITIONAL FINDINGS UNDER RULE 52 AND TO ALTER OR AMEND JUDGMENT (Document 77).

## EXHIBIT A

## CREDIBILITY OF WITNESSES

*James Wilson, Jr.*

The trial judge was justified in accepting the portions of this witness' testimony referred to at page 2 of the Opinion of July 13, 1962 (Document No. 71) in view of this record, which includes these items among others:

1. The witness' testimony that he could remember the events surrounding the accident because of the dramatic and shocking death involved (N.T. 909) could well have been very persuasive to the fact finder.[1] The inability of the witness to remember the exact time[2] of the incident when the decedent warned his brother, due to the ball of flame which appeared on the wire near the boom (N.T. 929), does not mean that he could not remember the incident itself. The sentence in PE–10 that the witness did not see any flames or sparks when the boom was as close as two or three feet to the lowest wire (N.T. 923) is not necessarily inconsistent with the witness having seen an arc of flame the size of a ball when the boom was closer than two feet to that wire. It is not an uncommon experience for a witness to sign a statement that does not include all he knows about an incident, particularly when the statement is accurate as to the points it does include. Also, the witness had signed a statement (G–2) on the ball of flame incident prior to the accident (see 3 below) which was produced at the request of counsel for plaintiff (N.T. 871).

41. In addition to the evidence referred to at pp. 4–8 above, Gettis signed a statement (PE–13A–1) on September 26, 1957, which he testified on cross-examination was "in general" what he had said on that date (N.T. 2489), saying that both crane operators and himself agreed that the overhead wires carried at least 40,000 volts. This exhibit was received in evidence to the extent that it was used as a basis for cross-examination of Gettis by counsel for the Government (N.T. 3044) and this testimony was the only use made of this statement by such counsel.

42. This may have been true, but plaintiff has not sustained his burden of persuasion on it in the light of this record.

43. An index of the witnesses and exhibits appears at N.T. 3293 ff.

1. At N.T. 909, this witness testified on cross-examination by plaintiff's counsel:
"Some things you see happen stays with you, not a matter of time when it happened."

2. He testified that the incident was 30 to 45 minutes before the fatal accident (N.T. 931).

2. Plaintiff's witness, Gettis, testified that there were six or seven fellow workers of the decedent in the area other than the crane operators on the afternoon of the accident (N.T. 2489). Also, the witness was cross-examined about the soldiers stationed at this Nike Missile Site who were playing volley ball with him on the afternoon of the accident, September 25, 1957, (N.T. 879 & 948) and indicated the names of three or four of them who were playing volley ball on that afternoon (N.T. 879 & 948). He could not remember whether or not four others were playing volley ball (N.T. 948). The fact finder was entitled to take into consideration the failure of plaintiff to call any of these witnesses (particularly the three named at N.T. 879), who had opportunities to observe the ball of flame incident, in rebuttal of Wilson's testimony, particularly since Wilson testified on May 29 and evidence was presented as late as July 9.[3]

■■■ The fact finder was entitled to find that the testimony of the foreman that he did not see any such ball of fire was not persuasive, since Mr. Gettis was busily engaged from time to time at various places over an area 100 feet by 20 feet, including supervising the workers with jackhammers in the ditch where the noise from such jackhammers would have drowned out any popping sound[4] and where the foreman would have been looking down and not at the overhead wires. This testimony of the foreman was, at the most, negative testimony because his duties restricted his opportunities to observe whether or not this incident happened. See Enfield v. Stout, 400 Pa. 6, 13, 161 A.2d 22 (1960). The positive testimony of Wilson is stronger and is entitled to greater weight than such

negative testimony. See Window Glass Mach. Co. v. Pittsburgh Plate Glass Co., 46 F.2d 484, 494 (W.D.Pa.1921), aff'd. 284 F. 645 (3rd Cir. 1922), cert. den. 261 U.S. 623, 43 S.Ct. 518, 67 L.Ed. 832 (1923); Rapp v. Central R. R. of Pa., 269 Pa. 266, 270, 112 A. 440 (1921).

Since Mr. Bruns testified on cross-examination that he arrived at the accident site "a little after two" and left the area "about 20 minutes or more" later but the accident occurred "a matter of 15 minutes" after he left (N.T. 811), his memory of these times could not all be correct in view of the occurrence of the accident at 3:05. The fact finder was justified in finding that this "ball of flame" incident occurred when Mr. Bruns was not present and, hence, that he did not have the opportunity to observe it. It is significant that the foreman testified that he did not see Mr. Bruns prior to the accident (N.T. 2454) so that Mr. Bruns could not have been at the accident site very long, and Mr. Gettis could not have been observing all parts of the site every minute.

3. The witness gave a prior consonant statement to the F.B.I., stating (page 1 of G–2):

"* * * while I was engaged in the game of volleyball, I heard a loud noise. When I looked up, I saw the boom of this truck-crane sparking on an overhead wire. I recall that apparently the Morello brother who was the superintendent also saw this boom sparking on the overhead wire, because he walked over to the ditch and the crane, and pointed to the wire, as if warning the crane operator to be careful of the overhead wire. The Morello brother who walked over to the crane was the same person who was later

---

3. Also, it is noted that the trial was recessed on May 30, on June 6 until June 9, and on June 14 until July 5, during which periods counsel had the opportunity to interview other witnesses.

4. At N.T. 2454 ff., Gettis made clear that it was his testimony that he could have seen any ball of flame on the wire or any

other occurrence at the accident site if he were looking and the trial judge was not required to hear him state his conclusion on a matter on which the fact finder had the responsibility of making the finding (see complaint at pp. 35 ff. and 17 of plaintiff's brief). Also, the fact finder was entitled to reject this opinion or conclusion on this record.

killed. \* \* \*" (Statement goes on to describe the later fatal accident.) [5]

He explained the inaccurate part of that statement which mentioned a 15-minute period between the incident and the accident as resulting from his desire to terminate the interview with the F.B.I. agent since "he was eating up my lunch hour" (N.T. 954).[6]

4. The electrical expert with the greatest background knowledge of this accident (Mr. Van Name) did not testify, as stated by plaintiff at page 22 of plaintiff's brief, that there would be a tripping of the line at the Philadelphia Electric substation if there was an arc alone, but that there would have to be an arc and grounding for such tripping to take place (N.T. 260–2). At the time Wilson saw the ball of fire, there may well have been no grounding because the rubber tires provided a degree of insulation (N.T. 310). The fact that grounding occurred at the time of the fatal accident, when there was actual contact for several seconds between the boom and the overhead wire, does not mean that there would necessarily be grounding when there was an arc of very short duration without any such contact. Mr. Lerner (who was not a very convincing witness) did not have sufficient knowledge of the Philadelphia Electric Company equipment to make his views on tripping have anything but minimal weight, which the fact finder was entitled to reject.

### H. Jackson

The discussion of the reasons for the admissibility of Jackson's testimony, as well as parts of the record which are not referred to in that discussion, disclose that the fact finder was justified in considering these factors, among others, in deciding to accept the basic testimony of this witness, including his testimony that the decedent was leaning against the wheel of the crane:

1. Jackson gave straightforward testimony of the events immediately before and after the accident which was fully consistent with the basic facts in the record, in spite of lengthy cross-examination by counsel for plaintiff covering over 100 pages (N.T. 2889–2903, 2911–2974, 2978–9, 3002–3025) after a direct

---

5. There was no objection to this statement (Exhibit G–2) insofar as it was used during the trial as a prior consonant statement (N.T. 2236). See, also, as to admissibility of prior consonant statements in Pennsylvania, Risbon v. Cottom, 387 Pa. 155, 162–163, 127 A.2d 101 (1956); Keefer v. Byers, 398 Pa. 447, 159 A.2d 477 (1960); Commonwealth v. Ford, 199 Pa.Super. 102, 109, 184 A.2d 401 (1962). The extent to which plaintiff's counsel apparently felt it was necessary to go to attack this witness is illustrated by his reference (pp. 23–24 of plaintiff's brief) to a comment of the trial judge in findings (N.T. 2279 ff.) made (a) in connection with rulings on a Motion to Dismiss (N.T. 2260) a cross-claim of the Morello partners against Philadelphia Electric Company (Document No. 49), to which plaintiff was not even a party, and (b) on a record quite different from the record which was the basis of the findings of July 13, 1962 (Document No. 71), which plaintiff is attacking in these post-trial motions. In fact, in the attack by plaintiff's counsel on this witness, he refers at length to a statement of the witness which was not even in evidence at the time of such earlier findings at N.T. 2279–82 (see PE–10, received in evidence at N.T. 2369) and other pages of the record subsequent to such findings (see reference at pp. 17 & 21 of plaintiff's brief to N.T. 2431–3 and 2456–7).

6. The fact that the witness was interviewed for less than an hour at the scene of the accident by counsel for defendant and third-party defendant is no reason to reject his testimony (see page 16 of plaintiff's brief). Counsel for plaintiff had on at least two occasions in the fall of 1961 gone over the testimony of J. B. Gettis, Jr. with him (N.T. 2468 and 2478) and had prepared a statement which the witness signed in November 1961 (P–26). The record makes clear that the interviews of counsel for plaintiff with Mr. Gettis were far more lengthy than the interview of counsel for defendant and third-party defendants with Wilson, and no summary statement was prepared by counsel for Wilson which he and his counsel could have available for their guidance immediately before, and at the time that, he took the stand.

examination which covers 11 pages of the record (N.T. 2876–2887).

2. Although this witness gave one statement (PE–17) [7] which did not mention that the decedent was leaning against the wheel of the crane, he gave at least one other prior statement (G–8A) consonant with his statement at the trial containing this language:

> "JACKSON stated that at approximately 2:30 p. m. he heard a loud explosion or something similar to that and he turned around to see PETE MORELLO badly burned. MORELLO was half sitting against a crane being operated by his brother whose name he did not recall. They were preparing to move the crane back to their storage yard for another project the next day. He believes that the top of the crane was approximately 12 feet from the high tension wires overhead when apparently an arc was formed between the crane and the high wires. PETE MORELLO was immediately killed and turned black all over. They tried to revive him but it was too late. His brother who was operating the crane was right there but there was nothing anyone could do."

As pointed out above at page 27, since plaintiff did not confront Jackson with his statement, the fact finder may well have inferred that this statement was also consistent with the testimony Jackson had given at the trial.

*J. B. Gettis, Jr.*

The trial judge was justified in rejecting parts of the testimony of this witness, such as that he saw the decedent two or more feet from the crane as he was "bowled over" from the results of the contact between the crane and the electric transmission wire and his opinion as to the next indicated move of the crane (N.T. 723–4), in view of these, among other, parts of the record:

1. The day after the accident, this witness had signed a statement (W–4) saying that the decedent "was apparently touching the crane at the time it touched the wire." Although Mr. Gettis denied that this was correct when he was being cross-examined, after having been called as a witness for plaintiff at the trial (N.T. 2482 ff. and 2544), he conceded that he had signed the statement (N.T. 2480) and read it before he signed it (N.T. 2543),[8] and that his recollection of the events surrounding the accident would have been "much better" at the end of September 1957 than four years later (N.T. 2534). The reasons for accepting the contrary testimony of H. Jackson as to the location of the decedent at the time of the accident are stated under the discussion as to Jackson above.

2. The fact finder was clearly justified in finding that this witness was inaccurate in testifying that he was the first one to get to the decedent after his clothes had been burned and that W. Morello was still on the crane at that time (N.T. 2465), in view of the more probable testimony of Jackson that the decedent's brother first came to his aid (N.T. 2879 and 2956). Also, the fact finder was justified in accepting Jackson's testimony that he got to the de-

---

7. The investigator who took this statement testified that PE–17 was his summary of what the witness stated to him (N.T. 3119), that his main purpose in taking the statement was to determine whether Philadelphia Electric was in any way responsible for the accident, and that he might have omitted from the statement material Jackson told him which was not, in his opinion, significant to the investigations (N.T. 3121), but that if Jackson had told him he had seen the decedent squatting with his back against the rear wheel of the crane, he would have put it in his written record (N.T. 3089). Furthermore, he did not develop in his interview with Jackson anything inconsistent with the decedent being located in a crouched position near the right rear wheel of the crane at or before the time of the accident (N.T. 3079–80). The investigator also conceded that investigators were not infallible (N.T. 3135).

8. On redirect, he changed his testimony and stated that he might not have read the statement before signing it.

cedent before Mr. Gettis (N.T. 2879 and 2956–7).

3. Other inconsistencies between this witness' statements given in the fall of 1957 (W–4, PE–13A–1 and D of M–5) and his testimony at the trial—e. g., N.T. 2534–6 and 2540–1 (testified that decedent "curled up on ground" as in D of M–5 is not accurate).[9]

4. The witness exhibited hostility to counsel for Morellos which he openly expressed at the end of his cross-examination when called for the second time on behalf of plaintiff, due to a misunderstanding on his part that such counsel had made derogatory remarks about his brother (N.T. 2632–3).

---

9. In view of the several inconsistencies between the testimony of the foreman during the trial and between such testimony and his statements made at or about the time of the accident, the practice of counsel for plaintiff in recalling to the foreman what his testimony had been previously on a point being covered a second time in his testimony (for example, N.T. 2611–2) made it difficult for the fact finder to determine exactly how much of a present recollection of events occurring 4½ years before the trial this witness actually had and fully justified the warning to plaintiff's counsel to permit the witness to give his testimony unaided, particularly in view of similar instances in the record prior to that time.